830 So.2d 1113 (2002)
STATE of Louisiana, Appellee,
v.
David DALLAS, Appellant.
No. 36397-KA.
Court of Appeal of Louisiana, Second Circuit.
November 6, 2002.
*1115 Paula C. Marx, Lafayette, for Appellant.
Richard P. Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Tommy J. Johnson, Jason W. Waltman, Assistant District Attorney, for Appellee.
Before BROWN, WILLIAMS and KOSTELKA, JJ.
WILLIAMS, J.
The defendant, David Dallas, was charged by bill of information with aggravated second degree battery, a violation of LSA-R.S. 14:34.7. After a jury trial, the defendant was convicted of the lesser offense of second degree battery, a violation of LSA-R.S. 14:34.1. He was sentenced to serve four and one-half years at hard labor. The defendant now appeals. He contends the evidence presented was insufficient to support a jury verdict and the sentence imposed is excessive. For the following reasons, we affirm.

FACTS
Charles Odom ("Odom") and James Ford ("Ford") were roommates for approximately three months at Odom's residence in Shreveport, Louisiana. Ford moved out of Odom's residence near the end of October 1999. Odom met the defendant, David Dallas, when they worked together during the summer of 1999. Odom testified that during the time they were roommates, Ford bought crack cocaine from the defendant. He stated that Ford owed the defendant money. Odom testified that after Ford moved out, the defendant came to the residence on at least three occasions looking for Ford. During a visit to Odom's home prior to the incident in question, the defendant was accompanied by Frederick Carson ("Carson"). According to Odom, the defendant stated that Odom had "better not be there the next time" the defendant came back.
On November 17, 1999, Odom returned to his home after work at approximately 8:00 p.m. He went to sleep on the sofa in his living room. He was awakened by the sound of someone opening his gate and porch door. Odom thought it was Ford because Ford still had a key to the residence. The front door opened and the defendant entered with Carson and another man, identified only as "Kendell." Carson sat in a chair while Kendell stood at the door with a stick. The defendant pointed a gun at Odom, which appeared to be a .38 caliber automatic handgun. Odom told the defendant that Ford was not there, and he was living at the Salvation Army.
According to Odom's trial testimony, the defendant then told Odom that he was going to kill him. He picked up a pillow and pointed the gun at Odom, but did not shoot. When Odom begged for his life, the defendant gave him three options: (1) receive a severe beating; (2) have a finger cut off; or (3) death. Kendell grabbed Odom's hand and put it on the coffee table. Carson then took out a meat cleaver and cut off the pinkie finger of Odom's right hand. When the meat cleaver did not completely sever Odom's finger, the men used a saw to cut it off. During the incident, the defendant stood less than two feet away from Odom with a gun pointed at Odom's head. Carson picked up the finger and the men left. Odom opined that the incident was well planned, and the defendant was in charge of the situation.
Because Odom did not have a telephone, he wrapped his hand in a towel and went to a nearby gas station to call the police. He was transported to LSU Medical Center where he spoke with police and told them that the defendant had cut off his finger. Odom stated that he had considered *1116 the defendant a friend before the incident. Odom told the police that he had never had a dispute with the defendant and the defendant did not have any reason to harm him. Odom thought the defendant committed the offense because he was extremely upset that he did not receive his money from Ford and wanted to show others that he was tough.
Shreveport Police Officer Mike McConnell interviewed Odom at LSU Medical Center. According to Officer McConnell, Odom stated that the defendant and two others broke in through the front window of his home, there was a struggle and the defendant pulled out a cleaver and cut off his finger. Odom told Officer McConnell that the defendant said, "James Ford owes me money, so I'm taking your finger." When Officer McConnell arrived at the residence, the absence of broken glass on the floor led him to believe that the window had been previously broken. Officer McConnell recovered several small plastic bags containing what appeared to be crack cocaine residue and several crack pipes.
Shreveport Police Department Detective Rod Johnson of the Violent Crimes Unit also spoke with Odom at LSU Medical Center. Detective Johnson testified that according to Odom, three black males forcibly entered his home and one was armed with a handgun. Odom stated that he thought the intruders came in through the window. Odom further stated that he and the men wrestled and the taller man cut off his finger with a meat cleaver. Odom informed Detective Johnson that the defendant was one of the men. Detective Johnson went to Odom's home, but did not find any evidence of a forcible entry.
Detective Johnson also interviewed Ford. After Ford directed him to the defendant's residence, Detective Johnson obtained a search warrant. Detective Johnson testified that when the search warrant was executed, law enforcement officers found Carson in the kitchen, attempting to hide with the meat cleaver. The officers also recovered the defendant's state ID card and drug paraphernalia. Carson informed the officers that he and the defendant went to look for Ford because of a $90 debt. Carson further stated that they held Odom down, and the defendant ordered Carson at gunpoint to cut off Odom's finger. Detective Johnson testified Carson informed him that he hit Odom's finger once with a knife, but it did not cut through, so he ran out of the house. According to Carson, the defendant finished cutting off the finger and put it in a bottle.
Carson later pled guilty to aggravated second degree battery. At the defendant's trial, Carson testified that only he and Kendall went to Odom's house. Although Carson admitted that he had previously told Detective Johnson that the defendant was present when Odom's finger was severed, Carson testified that the defendant was not present when Odom's finger was severed. Carson also testified that although the defendant had previously resided with him, they were no longer living together. Carson denied that he had told Detective Johnson that he and the defendant were going to see someone about money.
Carson further testified that neither Odom nor Ford owed money directly to him, but admitted that the money Ford owed to the defendant belonged to him. He testified that he had never been to Odom's residence before the night of the incident. According to Carson, he cut off the victim's finger, wrapped it in paper towels and put it in his pocket. Carson testified that he kept the finger in a jar in order to brag to people on the street. Carson further testified that Detective Johnson informed him that if he gave a *1117 statement, he would be released. Once he was released, Carson showed the finger to the defendant and told the defendant that the police were looking for him.
At trial, the defendant denied any involvement in the crime. He testified that he did not tell anyone to cut off Odom's finger nor did he know that it was going to happen. The defendant testified as to the following events: He met Odom while they worked together during the summer of 1999. When he later did not have employment, he moved in with Carson and his parents before moving in with his sister. Carson's parents gave Carson money. In order to lead Carson's parents to believe that the defendant was employed, he and Carson decided that the defendant would sell drugs for Carson. Odom introduced the defendant to Ford and vouched for his credit. The defendant sold drugs to Ford on credit, but eventually Ford stopped paying for the drugs in a timely manner. The defendant had to give excuses to Carson. The defendant testified he did not feel that Odom was responsible for the debt. He further testified that Carson was pressuring him to collect the money and it created a rift between them.
The defendant testified he told Carson that Ford lived with Odom, but he did not go to Odom's home with Carson. He testified that he saw Carson later that night or the next day and Carson showed him a finger in a jar, which the defendant thought belonged to Ford. The defendant further testified he was at his sister's house, which was across the street from Carson's residence, when he saw the police enter to search the premises. According to the defendant, he saw Carson the next day and Carson told him that the police were looking for him with regard to drugs found next to his ID card. The defendant admitted that he fled to Kansas and was later apprehended there.
The defendant was subsequently charged with aggravated second degree battery. After a trial, the jury returned a responsive verdict of second degree battery. The defendant now appeals.

DISCUSSION
The defendant contends the evidence presented at trial was insufficient to support the jury's verdict of second degree battery. Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied, 605 So.2d 1089 (La.1992).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, *1118 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
In order to prove a second degree battery, the state must establish that the defendant: (1) committed a battery upon another; (2) without his consent; and (3) intentionally inflicted serious bodily injury. Serious bodily injury is defined as bodily injury which involves unconsciousness, extreme physical pain, protracted and obvious disfigurement, protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death. LSA-R.S. 14:34.1.
LSA-R.S. 14:24 defines principals to a crime as: "[a]ll persons concerned in the commission of a crime, whether present or absent and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals." In State v. Pierre, 93-0893, (La.2/3/94), 631 So.2d 427, 428, our supreme court stated: "[T]hose persons who knowingly participate in the planning or execution of a crime are principals." Moreover, a person who aids and abets another in a crime is just as liable as the person who directly commits the crime, although he may be convicted of a higher or lower degree of the crime, depending upon the mental element proven at trial. State v. Watson, 397 So.2d 1337 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).
The defendant contends there were inconsistencies between Odom's statement to the police and his trial testimony. In Odom's statement to the police, he claimed that the men entered his residence through the window, there was a struggle and the defendant pulled out a knife and personally cut off his finger. Additionally, in his statement, Odom did not indicate that the defendant was armed with a gun. During the trial, Odom testified that the men entered through the front door, Carson pulled out a knife and cut off his finger, and the defendant was armed with a gun. Odom explained that he told the police the defendant cut off his finger because he felt that the defendant was responsible for the attack.
When a witness is impeached, this simply means the jury, as the trier of fact, is presented with evidence that it could consider and weigh in determining the credibility of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury is prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of a number of factors the jury weighs in determining whether or not to believe the witness's trial testimony. State v. Dunn, 30,346 (La.App.2d Cir.2/25/98), 708 So.2d 512; State v. Bender, 598 So.2d 629 (La.App. 3d Cir.), writ denied, 605 So.2d 1125 (La.1992).
The jury was presented with the apparent contradictions in Odom's testimony. The jury implicitly assigned less weight to the police statements and made a credibility determination in favor of Odom's trial testimony. Such a determination addresses the weight of the evidence and not the sufficiency of the evidence. It is the function of the trier of fact to make such a determination. When the trier of fact makes a rational determination, it will not be disturbed on appeal.
During both his statement to the police and testimony at trial, Odom indicated that the defendant stated that he "wanted Odom's finger." In addition, there is no dispute that Odom's pinkie finger was severed up to the second knuckle. At trial, Carson denied that the *1119 defendant was involved in the incident. The defendant also denied any involvement in the offense. However, the defendant admitted that Odom's former roommate bought drugs from him, Odom vouched for his roommate's credit and the defendant was being pressured to collect the money. The evidence showed that the defendant was present, and actually committed the second degree battery or ordered that it be done. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that the defendant was a principal to the crime of second degree battery. We find that there was sufficient evidence presented to support the jury's verdict. Therefore, this assignment of error is without merit.
The defendant also contends the trial court did not adequately comply with the sentencing mandates of LSA-C.Cr.P. art. 894.1. He asserts that the near-maximum four and one-half-year sentence at hard labor, is excessive for a 23-year-old first felony offender. He also argues that the trial court's compliance with Article 894.1 was minimal and the trial court did not place sufficient emphasis on his lack of a criminal history and youthful age.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.), writ denied, 521 So.2d 1143 (La.1988). There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392, 394, writ denied, XXXX-XXXX (La.2/2/01), 783 So.2d 385; State v. Callahan, 29,351 (La.App.2d Cir.2/26/97), 690 So.2d 864, writ denied, 97-0705 (La.9/26/97), 701 So.2d 979.
Secondly, whether the sentence imposed is excessive depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra.
After sentencing the defendant to serve four and one-half years at hard labor, the trial court explained that a lesser sentence would deprecate the seriousness of the offense. The trial court also found that during a period of a suspended or *1120 probated sentence, the defendant would likely commit another offense. Although the defendant was a first felony offender, the trial court was mindful that he fled from police after being warned that the police were looking for him. Further, the trial court found that the defendant was in need of correctional treatment, which was most effectively provided by incarceration. The trial court adequately complied with the requirements of LSA-C.Cr.P. art. 894.1 by articulating a factual basis for the sentence. See State v. Lanclos, supra.
Moreover, the jury's verdict for second degree battery does not adequately describe the defendant's particularly brutal conduct. While armed with a gun, the defendant ordered Carson to cut off Odom's finger with a meat cleaver over a $90 drug debt. Further, the defendant placed Odom's finger in a jar to use it to brag to and intimidate others. The circumstances of this case demonstrate that the sentence imposed is not excessive. Therefore, this assignment is without merit.
We have examined the record for error patent and find none.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.